## Fallabel v. Brophy-Wolter

C.P. of Carbon County, no. 05-0520.

*Richard N. Shapiro,* for plaintiff.
*Steven R. Serfass* and *John A. Adams,* for defendant.

NANOVIC, *P.J.,* November 26, 2008—

## PROCEDURAL AND FACTUAL BACKGROUND

The parties to this litigation are both professionals who, for 16 months (between August 11, 2003 and December 1, 2004), practiced dentistry together in an employer-employee relationship pursuant to a written employment contract. This contract, designated as an associate contract, provided for the employment of Shannon Brophy-Wolter by John Fallabel for an initial term of one year effective August 11, 2003. The agreement also provided for automatic renewal on an annual basis if not otherwise terminated (contract, section 2.1) and further provided that either party could terminate the contract without cause by giving 90 days written notice to the other. (Contract, section 6.1.)

At the time the contract was executed on July 30, 2003, Brophy had just graduated from dental school; Fallabel was a 51-year-old solo-practitioner with more than 26 years experience and with offices located at 1212 North Street, Jim Thorpe, Carbon County, Pennsylvania. Fallabel hoped—although not expressed in the contract—that if the arrangement were successful, Brophy would eventually purchase his practice and employ him, and after several years he would be able to retire. Unfortunately, the arrangement was not successful; Brophy chose to terminate the relationship; and Fallabel commenced the instant litigation.

Fallabel filed his complaint, in both equity and law, on March 14, 2005. In Count 1 of the complaint, Fallabel seeks to enforce and enjoin Brophy's alleged violation of a covenant not to compete, together with other provisions of the contract. In this count, damages, both spe-

cific and general, are requested. In Count 2 of the two-count complaint, Fallabel seeks liquidated damages as provided for in the contract for violation of certain provisions, as well as general relief.

Fallabel's request for a preliminary injunction was denied by the Honorable Richard W. Webb following a hearing held on April 8, 2005. Upon Judge Webb's retirement at the end of 2004, the case was assigned to the Honorable David W. Addy, who recused himself on May 2, 2007, at Fallabel's request, following a hearing on Fallabel's petition to enforce a purported settlement agreement which Judge Addy denied. The case was then assigned to the undersigned before whom a non-jury trial was held on September 21, 2007.

During the first year of the contract it appears that the parties' employment relationship worked reasonably well. Brophy took her job seriously and worked hard. Fallabel agreed that she was "responsible, honest, hardworking, cooperative and professional while employed in [his] office." (N.T. 9/21/07, p. 58.) Although disagreements arose between Brophy and some of the longer-serving staff in the office and Brophy was, at times, offended by several comments made by Fallabel, these difficulties were not enough to cause either party to elect to sever their relationship or to opt not to renew the agreement after the first year. (Contract, section 2.1.)[1]

---

1. In characterizing these difficulties as being relatively minor, it is important to note that this is from Fallabel's perspective. Brophy did not testify at the time of trial and instead chose to rest immediately after the conclusion of Fallabel's case in chief.

During the latter half of September 2004, Fallabel and Brophy argued about the treatment provided to one of the patients Brophy had seen. A second argument occurred on October 1, 2004, about inputting the office's patient list into a computer which office staff had been in the process of compiling for approximately three months. The argument got out of hand and unfortunately things were said that should never have been said: Fallabel belittled, berated, and demeaned Brophy. Brophy was upset, mad and offended. She was also pregnant and less than a month away from delivering her first child. The argument ended with Brophy informing Fallabel that she was then and there giving him a 90-day notice of her intent to terminate the contract. Fallabel was dumbfounded and in disbelief at what was happening. He apologized to Brophy later that same day, but it was too late.

Brophy was on maternity leave from October 8 to November 5, 2004. During this period, Fallabel received a mailed letter from Brophy dated October 21, 2004, confirming, in her words, the "agreement [they] made on October 1, 2004, stating that [their] contract would be terminated in 90 days" and calculating the official termination date to be December 29, 2004, that is, 90 days from October 1, 2004. Notwithstanding the contractual requirement that the 90-day notice be in writing, Fallabel acquiesced in this timing of Brophy's departure, hoping nevertheless that he would be able to convince her to change her mind.

Within a week after Brophy's return from maternity leave, Fallabel learned that Brophy's decision to leave

was irrevocable. At that time, Brophy told him that she had purchased the LeMaster's building along Route 443 in West Penn Township, Schuylkill County, Pennsylvania and planned to open her practice there. He also learned that Brophy was planning to take Tina Gerhardt, a front desk receptionist, with her. Ms. Gerhardt replaced another employee of Fallabel's (Jennifer Soates) who had been hired to support the addition of Brophy to his practice. Ms. Gerhardt was trained from scratch by Fallabel for this position. She was also Brophy's cousin.

Devastated by this turn of events, and also determined to enforce his contractual rights, Fallabel drove from his office to the LeMaster's building to measure the distance between the two. It was less than 15 miles. The parties' contract provided that Brophy would not open a competing dental practice for a period of 12 months after termination of her employment within a straight-line radius of 15 miles of Fallabel's office. (Contract, section 8.2.) The contract further provided that Brophy would not solicit any of Fallabel's patients or staff during this same 12-month time frame. (Contract, sections 8.3 and 8.7.)[2]

---

2. "At a minimum, for a non-competition or restrictive covenant to be enforceable, it must be 'reasonably related to the protection of a legitimate business interest.' " *WellSpan Health v. Bayliss,* 869 A.2d 990, 996 (Pa. Super. 2005) (quoting *Hess v. Gebhard & Co. Inc.,* 570 Pa. 148, 160, 808 A.2d 912, 918 (2002)). If this threshold requirement is met, the court must next balance the private and public interests at stake: the employer's protectable business interest against the employee's interest in earning a living, and the interests of the employer and employee with the interests of the public, in particular, when the covenant involves a healthcare professional, the paramount interest of the public in access to healthcare. See *WellSpan Health,* 869 A.2d at 999; *New Castle Orthopedic Associates v. Burns,* 481 Pa. 460, 469, 392 A.2d 1383, 1387-88 (1978).

Within days, Fallabel advised Brophy that where she intended to locate was too close to his office and she should get an attorney. She did. On December 1, 2004, Fallabel received a hand-delivered letter from Brophy's counsel accusing Fallabel of workplace harassment and declaring that the agreement was immediately termi-

---

In addressing the private interests, to be valid and enforceable a restrictive employment covenant must be (1) reasonably limited in duration of time and geographic extent, (2) reasonably necessary to protect the employer without imposing an undue hardship on the employee, (3) ancillary to an employment relation, and (4) supported by consideration. See *Hess,* 570 Pa. at 157, 808 A.2d at 917; see also, *John G. Bryant Co. Inc. v. Sling Testing and Repair Inc.,* 471 Pa. 1, 11, 369 A.2d 1164, 1168 (1977). "In contrast, a post-employment covenant that merely seeks to eliminate competition per se to give the employer an economic advantage is generally not enforceable." *WellSpan Health,* 869 A.2d at 996. Additionally, "[t]he law is clear that the burden is on him who sets up unreasonableness as the basis of contractual illegality to show how and why it is unlawful." *John G. Bryant Co. Inc.,* 471 Pa. at 12, 369 A.2d at 1169.

Brophy has not proven that the non-competition covenant found in section 8.2 is unreasonable. At the time of trial, the evidence was undisputed that 80 percent of Fallabel's patients live within 15 miles of his practice. The preservation of patient relationships is a legitimate, protectable business interest. See *WellSpan Health,* 869 A.2d at 997 (discussing various protectable interests recognized by our Supreme Court). Further, the geographic area and time period set forth in this covenant were specifically negotiated between Fallabel and Brophy, who was represented by counsel at the time the contract was entered, and the duration, at Brophy's request, was reduced from 24 months in the initial draft to 12 months in the final contract. The evidence is also undisputed that within one year of the contract's termination Brophy was able to attract approximately 700 patients to her practice. Finally, no evidence was presented of a shortage of dentists or unmet patient demands within the restricted area; instead, the evidence established that within this area between 80 to 85 dentists maintain a dental practice.

nated.[3] This basis for termination was not pursued at trial.

The parties do not dispute that the LeMaster's building is within 15 miles of Fallabel's office. They also agree that prohibiting Brophy from opening a practice at this location at this time is no longer a viable remedy. The one-year restriction on opening an office within 15 miles of Fallabel's office has long since passed. The question is one of damages: for what, how measured, and in what amount.

Fallabel presented expert testimony from his certified public accountant of 29 years, Geoffrey B. Borda, that during the one-year period between December 1, 2004 and November 30, 2005, he sustained a loss in net patient income of somewhere between $116,000 and $145,000 attributable to Brophy opening an office within 15 miles of his. Fallabel also contends that within one year of the termination date, Brophy employed a dental hygienist and receptionist who had been employed by him during the term of their employment relationship and that, in accordance with the contract, he is entitled to liquidated damages of $7,500 for the hygienist and $5,000 for the receptionist. (Contract, section 8.7.) Fallabel also claims that as the prevailing party, pursuant to the contract, he is entitled to recover all costs of litigation, including his legal fees and expert witness expenses. (Contract, section 13.11.) Brophy disputes that these, or any damages, are due, or have even been proven.

---

3. Under the contract, if the decision to terminate is for cause, as that term is defined in the contract, no period of advance notice is required for termination. (Contract, section 6.2.)

## DISCUSSION

In a breach of contract claim, a plaintiff must prove three elements: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." See *Omicron Systems Inc. v. Weiner,* 860 A.2d 554, 564 (Pa. Super. 2004). To sustain this burden, the elements must be proven by a preponderance of the evidence. See *Snyder v. Gravell,* 446 Pa. Super. 124, 127, 666 A.2d 341, 343 (1995), *appeal denied,* 544 Pa. 676, 678 A.2d 366 (1996).

It is the province of the fact-finder to determine what loss, if any, has been sustained and in what amount. See *Omicron Systems Inc.,* 860 A.2d at 564. In doing so, "[t]he fact-finder must assess the testimony, by weighing the evidence and determining its credibility, and by accepting or rejecting the estimates of the damages given by the witnesses." *Id.*

### 1. *Compensatory Damages*

In order to establish compensatory damages, the burden is upon the proponent to produce evidence which affords a reasonably fair basis for calculating the amount of loss actually sustained. See *Kaczkowski v. Bolubasz,* 491 Pa. 561, 567, 421 A.2d 1027, 1030 (1980). Though such evidence need not quantify damages according to a standard of mathematical exactness, it must, at a minimum, fairly approximate actual damages caused by the breach. See *Fish v. Gosnell,* 316 Pa. Super. 565, 583, 463 A.2d 1042, 1051 (1983). Where one party has been injured and another is at fault, and the only uncertainty is in valuing the loss because certain types of damages are not capable of

precise measurement or because they are of an inherently uncertain nature, recovery will not be denied if the evidence presented affords a fair basis for making a reasonable calculation of the loss sustained. See *Greer v. Bryant,* 423 Pa. Super. 608, 618, 621 A.2d 999, 1004-1005 (1993). Under these circumstances, "[s]ubstantial justice is better than exact injustice." *Osterling v. Frick,* 284 Pa. Super. 397, 404, 131 A. 250, 252 (1925).

To a certain extent, the fact-finder may use a measure of speculation in estimating damages: "The fact-finder may make a just and reasonable estimate of the damage based on relevant data, and in such circumstances may act on probable, inferential, as well as direct and positive proof." *Omicron Systems Inc.,* 860 A.2d at 565. However, damages cannot be awarded on the basis of speculation, guesswork, or conjecture. *Id.*

Borda testified that he computed Fallabel's loss by averaging Brophy's actual monthly gross receipts from patients for the second and third quarters of 2004, applied a productivity factor to this monthly average based on anticipated future growth in the number of patients she would have seen had she remained in Fallabel's employ, and made an adjustment for a fee increase which Fallabel implemented in March 2005. From this monthly average, Borda subtracted the expenses attributable to this income, including Brophy's anticipated salary computed pursuant to the contract, to determine a projected loss of net income for 2005. On cross-examination, however, it became apparent that these figures bore no relationship to any actual damages Fallabel may have sustained from a breach of the covenant not to compete.

Borda candidly admitted that his calculations had nothing to do with where Brophy located her office. Whether Brophy opened her office within a 15-mile radius of Fallabel's office, beyond this 15-mile range, or decided not to open an office at all, made no difference in Borda's computation of the amount of the loss sustained by Fallabel for Brophy's breach of the contract's covenant not to compete. In effect, the amount computed by Borda was not an estimate of any loss sustained by Fallabel due to competition from Brophy, but was the projected amount Fallabel would have realized had Brophy remained in his employment for an additional year.

The two are not the same: while Brophy was clearly prohibited by the contract from competing within the restricted 15-mile territory for one year after termination of the contract, she was not obligated by the contract to remain in Fallabel's employ for one year following notice of her intent to terminate. At most, she was committed to continuing her employment with Fallabel for 90 days after giving notice of her intent to terminate. Borda's testimony does not prove that Fallabel sustained any actual financial loss as a result of Brophy opening a dental practice within 15 miles of his office—an essential element of his claim.

## 2. *Liquidated Damages*

### (a) Solicitation of Patients

Beyond the issue of whether Borda has measured the proper damages is the equally important question of

whether Borda has assumed the proper measure of damages. At issue is whether a party may sue for a different measure of damages than that which was agreed upon in the contract. Specifically, as to damages for solicitation of Fallabel's patients, the parties' contract provides:

"[Brophy] will not solicit or aid in the solicitation of any patients of [Fallabel], for her own account or for the account of others, for a period of 12 months after the termination of this agreement. In the event of a breach of this subsection by [Brophy], then in addition to any other remedy the employer may have, [Brophy] will pay to [Fallabel], not as a penalty but as a reasonable estimate of damages, the liquidated sum of $350 for each patient of the practice who transfers to [Brophy] as a result of such solicitation." (Contract, section 8.3.)

"[A] provision which represents a good-faith and reasonable forecast of anticipated damages for breach which are otherwise difficult to prove with certainty will be construed as one for liquidated damages . . . ." *Geisinger Clinic v. DiCuccio,* 414 Pa. Super. 85, 101, 606 A.2d 509, 517 (1992), *appeal denied,* 536 Pa. 625, 637 A.2d 285 (1993), *cert. denied,* 513 U.S. 1112 (1995). Liquidated damages are those which "a party to a contract agrees to pay if he breaks some promise, and which, having been arrived at by a good-faith effort to estimate in advance the actual damage that will probably ensue from the breach, [are] legally recoverable . . . if the breach occurs." *Pantuso Motors Inc. v. CoreStates Bank N.A.,* 568 Pa. 601, 608, 798 A.2d 1277, 1282 (2002). Liquidated damage clauses are enforceable provided, "at the time the parties enter into the contract, the sum agreed

to is a reasonable approximation of the expected loss rather than an unlawful penalty." *A.G. Cullen Construction Inc. v. State System of Higher Education,* 898 A.2d 1145, 1162 (Pa. Commw. 2006); see also, *Geisinger Clinic,* 414 Pa. Super. at 99, 606 A.2d at 516 (1992) (identifying four criteria to differentiate a liquidated damage provision from a penalty or forfeiture term in a restrictive covenant clause of an employment agreement). When the parties to a contract have themselves agreed upon a fair means of measuring damages which are difficult to estimate in advance or to prove after a breach occurs, the fundamental fairness of awarding damages as bargained-for by the parties should be beyond reproach. See *Worldwide Auditing Services Inc. v. Richter,* 402 Pa. Super. 584, 594, 587 A.2d 772, 777-78 (1991) ("Damages arising out of a breach of a covenant not to compete are difficult to compute with precision."); see also, *West Conshohocken Restaurant Associates Inc. v. Flanigan,* 737 A.2d 1245, 1249 (Pa. Super. 1999), *appeal denied,* 563 Pa. 619, 757 A.2d 934 (2000) (limiting total damages for breach of a contract to the liquidated damages set forth in the contract).

The contract in issue does not provide that Brophy *may* be subject to certain defined damages for soliciting and accepting Fallabel's patients. Rather, it provides that in such event, Brophy "*will* pay to [Fallabel], not as a penalty but as a reasonable estimate of damages, the liquidated sum of $350 for each patient of the practice who transfers to [Brophy] as a result of such solicitation." (Contract, section 8.3.) (emphasis added)[4]

---

4. Fallabel's argument that an alternate measure of damages is permitted because the contract provides that an injured party is entitled

This provision, however, is of no benefit to Fallabel since no evidence was presented that Brophy acquired any of his patients during the prohibited period. The burden is upon the party claiming a breach to establish that breach and to prove that liquidated damages are due and owing. *A.G. Cullen Construction Inc.,* 898 A.2d at 1162.[5]

---

to liquidated damages "in addition to any other remedy," misreads the agreement. Since liquidated damages are a substitute for actual damages, permitting the recovery of both liquidated and actual damages for the same loss could be nothing but a penalty. We do not believe this was intended by the parties. Instead, a fair and plausible reading of this language, and the one we accept, is that the term "any other remedy" refers to other remedies, including equitable relief, for harm which is not otherwise compensated for and contemplated by the provision for liquidated damages. Cf. section 8.9 of the contract (providing that equitable remedies are available when monetary damages are insufficient to adequately compensate for a breach of duty imposed by the agreement).

5. In an attempt to correct this deficiency, Fallabel asks that we consider his testimony at the preliminary injunction hearing held before Judge Webb on April 8, 2005. Fallabel argues that this testimony is automatically part of the trial record and must be considered as a matter of law. In response, Brophy argues that it would be fundamentally unfair to consider this testimony; that, at the time of trial, the parties reached a stipulation to incorporate the preliminary hearing testimony of Ralph Clay, a surveyor, but not that of Fallabel; and that based upon this stipulation and her assessment of the testimony Fallabel presented at trial, she made a tactical decision to rest her case without presenting any evidence.

At the time of trial, counsel for both parties represented to the court that a stipulation had been reached to incorporate the testimony of Mr. Clay taken at the preliminary hearing, thus avoiding the necessity of calling this witness again at trial. As pertinent to this issue, the following exchange occurred at the time of trial:

"The Court: So the testimony in the preliminary injunction hearing before Judge Webb with respect to Mr. Clay has been stipulated to and will become part of the record in this proceeding?

142

## (b) Solicitation of Staff

Section 8.7 of the contract prohibits Brophy for a period of 12 months after termination of the agreement from hiring or engaging the services of any hygienist, dental assistant, or any other person employed by Fal-

"Mr. Shapiro: Yes. And I guess the affidavit of Mr. Clay that was marked and admitted in the hearing was stipulated to as well.

"The Court: I know that Dr. Fallabel also testified at that time. His testimony is not being stipulated as being made part of this proceeding, just so I am clear?

"Mr. Shapiro: Yes, that is correct.

"The Court: Okay. So the stipulation is that Mr. Clay's testimony in its entirety, plus his affidavit which I believe was marked as exhibit 7 in that proceeding is admitted in this proceeding?

"Mr. Adams: That is correct, your honor.

"The Court: So stipulated and it will be admitted. Dr. Fallabel, you can take the stand. Mr. Clay, you are free to go." (N.T. 9/21/07, p. 68.)

Under these circumstances, we agree that it would be fundamentally unfair to enlarge the record beyond that which was agreed to at the time of trial. Had such evidence been offered by Fallabel and admitted by the court, at a minimum Brophy would have been placed on notice that all of the testimony taken at the preliminary hearing would be considered by the court, and she would have had an opportunity, in light of this notice, to decide whether to cross-examine Fallabel about his prior testimony and whether to present any direct testimony to the contrary. Cf. *Lackey v. Sacoolas,* 411 Pa. 235, 239, 191 A.2d 395, 397-98 (1963) (upholding the trial court's incorporation of the testimony from a preliminary hearing into the final hearing on the injunction, over defendants' objection, where defendants had a full opportunity to present additional direct testimony and to subject the witnesses at the preliminary hearing to cross-examination).

We further believe that absent a stipulation by the parties or Fallabel's request at the time of trial to incorporate this testimony, with a full opportunity for Brophy to respond, Fallabel's preliminary hearing testimony cannot be considered. Unlike Federal Rule of Civil Procedure 65(a)(2) which automatically incorporates that evidence from a preliminary injunction hearing which is admissible at trial into the trial

label at any time during the term, until 12 months after such person was last employed by Fallabel, without Fallabel's consent. Similar to section 8.3, section 8.7 further provides that "[i]n the event of a breach of this section 8.7 by [Brophy], and in addition to any other remedy which [Fallabel] may have, [Brophy] will pay to [Fallabel], not as a penalty but as a genuine estimate of damages, a liquidated sum equal to" $7,500 for any hygienist and $5,000 for any other employee hired by Brophy in violation of this restriction. Fallabel claims that Brophy hired two of his employees, a receptionist (Tina Gerhardt) and a hygienist in violation of the contract and that he is entitled to $12,500 in liquidated damages as a consequence.

Again, this claim has not been proven. Fallabel presented no evidence of any hygienist formerly employed by him who was hired by Brophy. With respect to Tina Gerhardt, Fallabel testified only that when he learned in November 2004 that Brophy had purchased the LeMaster's building and was intending to open a practice there, he also learned that Brophy was intending to have Gerhardt, her cousin, accompany her.

The agreement was not terminated until December 29, 2004, or December 1, 2004, at the earliest, the last day Brophy worked for Fallabel. Fallabel testified that after Brophy left, he asked Gerhardt to stay on and she asked to be laid off. Fallabel did so, however, there is no evi-

---

record, Pa.R.C.P. 1531 does not contain similar authority and is, in fact, silent on the issue. Moreover, Fallabel's preliminary hearing testimony does not fit the hearsay exception for former testimony since he in fact was available and was present at the time of trial. Pa.R.E. 804(b)(1).

dence that after Gerhardt left Fallabel's employ she was subsequently employed by Brophy.

### 3. *Counsel Fees*

The agreement in this case provides for an award of counsel fees to the prevailing party. (Contract, section 13.11.) Neither party, however, presented any evidence at the time of trial as to the amount or reasonableness of any counsel fees they incurred. Having failed to do so, this claim has been waived.

Attorney fees, when provided for in a contract, are an element of compensable damages resulting from a breach of duty imposed by the contract and which the parties have agreed the prevailing party is entitled to recover. Attorney fees, as so provided, are qualitatively distinct from attorney fees authorized by statute or other governing authority to be taxed as costs under certain specifically defined and limited circumstances. See *e.g.,* 42 Pa.C.S. §1726(a)(1) (providing that attorney fees are not an item of taxable costs except to the extent authorized by 42 Pa.C.S. §2503). In cases such as this, the recovery of attorney fees is part of the contract claim for which evidence of the fees incurred and their reasonableness must be presented to the fact-finder at the time of trial. Cf. *Matter of Howarth's Estate,* 310 N.W.2d 255, 257 (Mich. App. 1981) (In denying a claim for attorney fees because the expenses incurred were not introduced at trial, the court stated, "We believe that the better rule is to require introduction of evidence. A party asserting a breach of contract claim bears the burden of proving his damages with reasonable certainty. Appellee's claim for

attorney fees here was simply a claim for damages for breach of contract and should have been treated as any other such claim."). While the parties, with the approval of the court, can agree that the amount of compensable attorney fees will be determined in a post-trial evidentiary hearing, unless statutory or other authority exists to tax attorney fees as costs to be assessed after trial, a party proceeds at his own risk in failing to address this issue up front at the time of hearing. Such a request was not made by either party prior to the close of the evidence.[6]

## CONCLUSION

In accordance with the foregoing, Fallabel has failed to prove either compensatory damages caused by breach of the covenant not to compete or liquidated damages as provided for in the contract for soliciting patients or employing members of his staff. Therefore, judgment will be entered in favor of Brophy and against Fallabel on both counts of the complaint.

---

6. At the time of trial, the issue of attorney fees was first raised by Fallabel after both parties had rested. After expressing concern about the timing of the request, the court suggested that if both parties were in agreement, the issue of attorney fees could be addressed in a post-verdict proceeding. Brophy advised she would not agree with a post-trial submission and was taking the position that the issue had been waived by both parties. Moreover, since Fallabel is not a prevailing party under our decision, Fallabel's claim for attorney fees is moot.